UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

KEVIN RICHARD STAS,

       Plaintiff,

     v.

NAPLES LAND YACHT HARBOR,
INC., INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS
PRESIDENT OF NAPLES LAND
YACHT HARBOR, INC.; AND
MICHAEL A. ESPINOLA,
INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY AS
PRESIDENT OF NAPLES LAND
YACHT HARBOR, INC.,

       Defendants.

Case No. 2:25-cv-809-KCD-KRH

## **ORDER**

Plaintiff Kevin Richard Stas is a homeowner in the Naples Land Yacht Harbor community who is legally blind. To navigate his daily life safely, Stas requested that his son be allowed access to his home to serve as an essential medical caregiver. But the community's governing association, Naples Land Yacht Harbor, Inc., and its board president, Michael A. Espinola (collectively Defendants), pushed back. They treated Stas's son as an unauthorized guest, threatened Stas with thousands of dollars in compounding fines, and

allegedly coerced him into signing a restrictive "Performance Agreement" meant to banish his son from the property.

To allegedly protect his right to equal housing opportunity, Stas filed this lawsuit. (*See* Doc. 66.)[1] He brings four claims under the Fair Housing Act (FHA): failure to make a reasonable accommodation under 42 U.S.C. § 3604(f)(3)(B); discrimination in the terms, conditions, or privileges of housing under § 3604(f)(2); pre-filing coercion and interference under § 3617; and post-filing retaliation under § 3617 based on a community budget note that singled out his lawsuit by name. Defendants seek to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and strike Stas's demand for punitive damages. (Doc. 74.) For the reasons below, the motion is **GRANTED IN PART AND DENIED IN PART**.

## I. Background

Because we are here on a motion to dismiss, the facts alleged in the complaint are taken as true. Because of his vision loss and attendant mobility limitations, Stas requires daily assistance to navigate his home and manage basic activities. (Doc. 66 ¶ 12.) His son, Michael Stas, serves as his caregiver, providing routine daytime care and staying overnight when Stas's spouse is unavailable. (*Id.* ¶ 15.)

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

As best the Court can tell, the association insisted on treating Michael as a standard guest rather than a medical caregiver. Under the community's governing documents, guests apparently have limited privileges and cannot use the neighborhood as a permanent address. Michael, however, was at the property nearly every day. To manage the escalating tension over this daily presence and head off accumulating rules violations, the parties executed a "Performance Agreement" on February 4, 2025. (Doc. 74-1.)[2] The record is unclear on how this agreement came to fruition. But ultimately, it functioned as a strict countdown clock: it required Stas to find alternative living arrangements for Michael within two months, barred Michael from community common areas, and dictated a $200-per-day fine for any subsequent visits. (*Id.*) Exactly three months after signing that agreement, Stas shifted gears and formally submitted a written request for a reasonable accommodation under the FHA. He asked that Michael be allowed access to the community as a medical caregiver, rather than treating him as a guest subject to restrictive time limits. (Doc. 66 ¶ 18.)

---

[2] Stas left the Performance Agreement out of his pleadings. Ordinarily, a court deciding a motion to dismiss wears blinders, looking only at the four corners of the complaint. But under the incorporation-by-reference doctrine, a court may consider extraneous documents if they are central to the plaintiff's claim and their authenticity is undisputed. Those are the facts here. The Performance Agreement is the lynchpin of Stas's pre-filing coercion claim, and he does not challenge its authenticity in his response. *See Johnson v. City of Atlanta*, 107 F.4th 1292, 1300-01 (11th Cir. 2024). The Court will thus consider the document. The law simply does not permit a plaintiff to chain his complaint to a contract while simultaneously hiding its contents.

The association, however, stuck to its pre-negotiated guns. On May 27, 2025, it denied the accommodation request. (*Id.* ¶ 19.) Rather than engaging in an interactive dialogue to evaluate the request, the association allegedly weaponized the Performance Agreement's fine structure, treating Michael's presence as a rules violation and demanding thousands of dollars in compounding penalties. (*Id.* ¶¶ 21-23.)

The battle lines hardened further after Stas filed this lawsuit. The association distributed its proposed 2026 operating budget, which included a paragraph about this litigation:

> NOTE: THE 2026 BUDGET DOES NOT TAKE INTO CONSIDERATION THE CURRENT LAWSUIT OF STAS V. NAPLES YACHT LAND HARBOR. THE CORPORATE BOARD OF DIRECTORS ARE WORKING VERY HARD TO CONTAIN THE POTENTIAL ASSESSMENT TO BE ESTIMATED BETWEEN $500 - $1,000 PER HOUSEHOLD.

(Doc. 74-2.)[3] Stas alleges this public disclosure was a calculated attempt to invite community resentment and pressure him into dropping the case. (Doc. 66 ¶ 58.)

## II. Legal Standard

To survive a motion to dismiss, "a complaint must contain sufficient facts, accepted as true, to state a facially plausible claim for relief." *Galette v.*

---

[3] The budget document was also not attached to the complaint, but Defendants included it with their motion. For the same reasons discussed, the Court will consider it here under the incorporation-by-reference doctrine.

*Goodell*, No. 23-10896, 2023 WL 7391697, at *3 (11th Cir. Nov. 8, 2023). "A claim is facially plausible if it pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When reviewing a motion to dismiss, courts must accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

### III. Discussion

The Court starts with a threshold defense that spans the entirety of the motion to dismiss: Stas's complaint is a "shotgun pleading." (Doc. 74 at 15.) Defendants argue that by naming both the association and Espinola in every count, the complaint muddies the waters and fails to specify which defendant is responsible for which distinct acts. In their view, this structural overlap leaves Espinola in the dark about why he is facing individual liability under the FHA rather than just acting as a standard corporate agent. (*Id.* at 15-16.)

The Court is not convinced. The unifying characteristic of an impermissible shotgun pleading is that it is so hopelessly vague, disorganized, or cluttered with irrelevant facts that a defendant cannot be expected to frame a responsive pleading. *See, e.g.*, *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1208 (11th Cir. 2019). Stas's complaint clears that low bar. It is organized into discrete counts that give Defendants a clear map of the claims against them. And crucially, the complaint does not just lump Espinola in with the association. It explicitly alleges that, as board president, he possessed ultimate authority over the association's enforcement posture and personally authorized or directed each of the discriminatory actions, including the fine demands and the budget disclosure. Because corporate officers can be held individually liable under the FHA when they personally participate in discriminatory conduct, *Copemann v. Briel*, No. 1:11-CV-75-SPM-GRJ, 2011 WL 2292113, at *5 (N.D. Fla. May 6, 2011), Stas's targeted allegations provide all the notice the Federal Rules require. And contrary to Defendants' suggestion, a complaint does not become a shotgun pleading simply because it targets a corporate entity and its president for the same course of conduct. *See Portnoy v. MEI Condo. Ass'n, Inc.*, No. 23-CV-23475, 2024 WL 4575286, at *5 (S.D. Fla. Feb. 29, 2024); *cf. Green v. Miami-Dade Cnty.*, No. 08-20016-CIV, 2008 WL 11333589, at *1

6

(S.D. Fla. Oct. 16, 2008); *Aria Dental Grp., LLC v. Farmers Ins. Exch.*, 528 F. Supp. 3d 1359, 1363 (M.D. Ga. 2021).

With that threshold structural objection out of the way, the Court turns to the merits. The challenged claims are addressed in turn.

**Count II—Discrimination in Terms, Conditions of Privileges of Housing 42 U.S.C. § 3604(f)(2)**

Section 3604(f)(2) prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." *Id.* Stas maintains that Defendants violated this provision by imposing discriminatory conditions on his housing—namely, treating his medical caregiver as a rules-violating guest and targeting his household with cascading fines. (Doc. 66 ¶¶ 44-49.) Defendants counter with a narrow reading of the statutory text. They argue that § 3604(f)(2) applies exclusively to the initial *acquisition* of housing. (Doc. 74 at 6.) Because Stas already owned and lived in his home before this caregiver dispute arose, Defendants say that any subsequent, post-acquisition rule enforcement is insulated from challenge. (*Id.*)

Defendants' argument used to find some traction. *See, e.g., Schwarz v. Villages Charter Sch., Inc.*, No. 5:12-CV-177-OC-34PRL, 2014 WL 12623013, at *1 (M.D. Fla. May 23, 2014). But the Eleventh Circuit has since explained

that "the FHA is broad and inclusive, prohibits a wide range of conduct, has a broad remedial purpose, and is written in decidedly far-reaching terms." *Watts v. Joggers Run Prop. Owners Ass'n, Inc.*, 133 F.4th 1032 (11th Cir. 2025). In *Watts*, the plaintiff alleged that her homeowners' association selectively enforced neighborhood rules—from parking restrictions to community facility access—in a discriminatory manner against her family based on race. The district court rejected her claim because the discriminatory conduct was not "connected to the sale or rental of a dwelling" as needed under § 3604(b). *Id.* at 1038. The FHA provision at issue here "mirrors the language of" § 3604(b) except that it covers persons with a disability. *Id.* at 1041.

The Eleventh Circuit rejected the idea that homeowners' associations have a blank check to discriminate against residents once the closing papers are signed. Because association membership is a strict condition of buying into a planned community, the contractual rights and regulations that come with it are "directly connected to the sale" of the dwelling. *Id.* at 1043. So when a housing board weaponizes those rules against a black (or disabled) resident, it hits every element of an FHA claim by discriminating in the post-acquisition terms, conditions, or privileges of the sale. *See, e.g., Bloch v. Frischholz*, 587 F.3d 771, 780 (7th Cir. 2009) (holding the FHA "prohibits the

Association from discriminating . . . through its enforcement of the rules, even facially neutral rules.").

Stas seemingly alleges that the association discriminatorily enforced its visitor policy against him because of his handicap. (Doc. 66 ¶¶ 45-49.) As best the Court can tell, the community's visitor rules are part and parcel of the contractual rights flowing directly from his mandatory membership in Naples Land Yacht Harbor. Because those membership rights are "directly connected to the sale" of his home, an intentional, discriminatory twisting of the rules hitting a disabled resident, like claimed here, satisfies § 3604(f)(2). *See Watts*, 133 F.4th at 1043. Count II thus survives. *See, e.g.*, *Murphy v. Villages at Noah's Landing Ltd*, No. 8:25-CV-22-TPB-TGW, 2025 WL 2798185, at *6 (M.D. Fla. Sept. 30, 2025).

### Count III—Interference, Coercion, or Intimidation Pre-Filing Conduct 42 U.S.C. § 3617

The FHA's anti-retaliation provision makes it unlawful for anyone "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right" protected under the FHA. 42 U.S.C. § 3617. To state a claim under § 3617, a plaintiff "must demonstrate that (1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) there is a causal link between the adverse action and the protected

9

conduct." *Philippeaux v. Miami Apartments Invs., LLC*, No. 24-11468, 2025
WL 275402, at *6 (11th Cir. Jan. 23, 2025).

Stas alleges that he "exercised and attempted to exercise rights
protected by the FHA." (Doc. 66 ¶ 51.) That statement is not enough to
trigger the statute. A plaintiff cannot just drop statutory buzzwords or tell a
court that he exercised "rights" in the abstract. That kind of vague shorthand
is simply too broad to get this type of claim off the ground. *See Ashcroft v.
Iqbal*, 556 U.S. 662, 678 (2009).

But Stats's complaint does not stop with a broad abstraction. He also
anchors his claim to a concrete, real-world act: his May 4, 2025, written
request to the association for a reasonable accommodation to permit his son
to access his home. (Doc. 66 ¶ 51.) "Requesting a reasonable accommodation
constitutes protected activity." *Bone v. Vill. Club, Inc.*, 223 F. Supp. 3d 1203,
1218 (M.D. Fla. 2016).

As for the other elements, Stas claims that Defendants responded to his
accommodation request by turning up the economic heat. According to the
complaint, Defendants actively demanded thousands of dollars in
accumulated penalties under the Performance Agreement. "[I]nterference
requires discriminatory conduct that is so severe or pervasive that it will
have the effect of causing a protected person to abandon the exercise of his or
her housing rights." *Stowe v. Chalet Capri Condo. Ass'n, Inc.*, No. 8:23-CV-

2822-KKM-TGW, 2025 WL 3034803, at *4 (M.D. Fla. Oct. 30, 2025). Demanding thousands of dollars along with a $200-per-day fine is enough to force a person to surrender their statutory rights. *See Treece v. Perrier Condo. Owners Ass'n, Inc.*, No. CV 17-10153, 2019 WL 6464984, at *9 (E.D. La. Dec. 2, 2019). And because this aggressive fine enforcement followed closely on the heels of his protected request and the association's denial, Stas has pled a plausible causal link at this stage.

Defendants make a calendar-based pitch to throw this claim out. They note that the Performance Agreement—the allegedly coercive document giving rise to the fines—was signed on February 4, 2025, a full three months *before* Stas ever made his formal accommodation request. Relying on basic principles of causation, Defendants argue that a contract cannot logically be an act of illegal retaliation if it was executed before the protected activity occurred. *See Melvin v. Walmart Inc.*, No. 5:20-CV-51-MW/MJF, 2021 WL 5889995, at *4 (N.D. Fla. Nov. 9, 2021) ("By its very nature, retaliatory conduct must come after the protected activity.").

This argument misunderstands Stas's claim—at least as the Court must broadly construe it. He does not lock onto the mere signing of the contract in February. He challenges what Defendants chose to do with it *after* he asserted his statutory rights in May. By pressing the agreement and its heavy penalty clauses to demand thousands of dollars in fines, Defendants

11

allegedly transformed the parties' compromise into an active engine of coercion. It is Defendants' post-request weaponization, not the pre-request negotiation, that is at issue. Looking through the correct lens, Defendants' timeline argument is beside the point.

To be sure, the Court harbors real doubt about whether the Performance Agreement or Defendants' ongoing pursuit of the fines will ultimately cross the legal threshold to qualify as cognizable adverse action. The association argues with some force that it was merely exercising its lawful authority to enforce community rules and collect outstanding penalties that Stas had agreed to. (Doc. 74 at 14.) But sorting out where routine covenant enforcement ends and actionable FHA coercion begins is a highly fact-bound enterprise—one completely unsuited for this procedural posture. *See Arnal v. Aspen View Condo. Ass'n, Inc.*, 226 F. Supp. 3d 1177, 1188 (D. Colo. 2016). Whether Stas can ultimately prove that these financial pressures were unlawful is an issue for another day, be it at summary judgment or trial. For now, his allegations are enough to keep Count III alive.

**Count IV—Post-Filing Retaliation/Interference 42 U.S.C. § 3617**

Count IV takes us from pre-filing coercion to post-filing retaliation under § 3617. Stas alleges that after he protected his rights by filing this lawsuit, Defendants struck back. He points to a community-wide budget disclosure, which publicized this dispute and allegedly singled him out for

community-wide hostility. Defendants respond that a line-item budget disclosure is a routine business and fiduciary necessity. In their view, keeping association members informed of corporate expenditures cannot double as an "adverse action" under the law.

As mentioned, § 3617 makes it unlawful for anyone "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right" protected under the FHA. 42 U.S.C. § 3617. "The plain meaning of the first three words, coerce, intimidate, and threaten, requires either violent conduct or threatening conduct." *Stowe*, 2025 WL 3034803, at *4. Interference likewise "requires discriminatory conduct that is so severe or pervasive that it will have the effect of causing a protected person to abandon the exercise of his or her housing rights." *Id.* By way of example, "leaving a note threatening to break [plaintiff] in half if he did not get out of the neighborhood and running up to one of [plaintiff's] trucks, hitting it, shouting obscenities and spitting at [plaintiff] along with making racial slurs in a newspaper satisfy Section 3617's standard." *Id.*

On the other hand, the FHA does not create "a federal code of civility." *Id.* "Neither the FHA's text nor its legislative history indicates an intent to make quarrels between neighbors . . . a routine basis for federal litigation." *Bloch v. Frischholz*, 587 F.3d 771, 780 (7th Cir. 2009); *see also Truesdale v. Venice Arms, Inc.*, 713 F. Supp. 3d 1350, 1358 (S.D. Fla. 2024).

Measured against these benchmarks, the budget disclosure challenged here falls well short of the mark. (*See* Doc. 74-2.) Homeowners' associations are not just permitted to keep their members advised of outstanding legal liabilities; they are required to do so by basic fiduciary and administrative necessity. Considering that reality, the note is simply too benign to constitute actionable conduct under § 3617. The disclosure did not launch a campaign of vitriol or invite neighborhood shunning. It said nothing beyond dry, objective facts regarding an active dispute that directly impacts the community's financial ledger. *United States v. Pospisil*, 127 F. Supp. 2d 1059, 1063 (W.D. Mo. 2000) (allowing § 3617 claim where the defendant had engaged in cross burning). A community association cannot rightly be hauled into federal court for simply balancing its books and informing its membership about where their assessment dollars are going. Because a standard, factual accounting disclosure lacks the violence, threats, or pervasiveness required to show coercion or interference, Count IV fails to state a plausible claim for relief. *See, e.g., Hatfield v. Cottages on 78th Cmty. Ass'n*, No. 2:19-CV-964 TS, 2021 WL 778604, at *5 (D. Utah Mar. 1, 2021).

**Punitive Damages**

Finally, we have Defendants' request to strike Stas's demand for punitive damages. (Doc. 74 at 16-17.) Defendants argue that the complaint lacks the kind of egregious, high-octane misconduct required to support such

14

relief under the FHA. This case instead boils down to a dry, localized dispute over guest policies and property covenants—not the sort of "evil motive" or "callous indifference" that warrants punitive measures. (*Id.* at 17.)

Defendants are jumping the gun. Under the FHA, punitive damages are available when the antagonist acts with "evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 476 (11th Cir. 1999); *Bone*, 223 F. Supp. at 1220. But evaluating a defendant's mental state—that is, deciding whether their conduct was merely negligent or callously indifferent—is a deeply factual inquiry. *See Belcher v. Grand Rsrv. MGM, LLC*, 269 F. Supp. 3d 1219, 1246 (M.D. Ala. 2017). Stas has alleged that Defendants did not merely misinterpret a neighborhood rule. He claims they deliberately weaponized a fine structure against his necessary medical caregiver *after* receiving formal, written notice of his legal blindness. If discovery proves that the board intentionally pressured a disabled resident to surrender his statutory accommodations under the threat of mounting financial ruin, a reasonable factfinder could find reckless indifference to federally protected rights. *See, e.g.*, *Nazarova v. Hillcrest E. No. 22, Inc.*, No. 18-60387-CIV, 2018 WL 3544339, at *7 (S.D. Fla. July 3, 2018).

Whether Stas can ultimately meet the high evidentiary standard required to recover punitive damages is a question for another day. For now,

15

his allegations are enough to keep the demand on the table. The motion to strike is thus denied.

### IV. Conclusion

Stas's complaint is not a model of clarity, but the core of his FHA case survives today. To be sure, he has a steep hill to climb as this litigation moves forward. Pleading a claim is one thing, while proving it is quite another. That is especially true given the exacting causation standards Stas must eventually meet to establish that Defendants' behavior was an active engine of unlawful coercion rather than routine property management. Discovery may well show that the links between Stas's protected activity and the board's subsequent enforcement are too tenuous to sustain federal liability. But those are questions of evidence, not architecture. Because Counts I, II, and III present cognizable claims, Stas has successfully opened the courthouse doors to discovery.

Accordingly, Defendants' Motion to Dismiss (Doc. 74) is **GRANTED IN PART AND DENIED IN PART**. Count IV is dismissed, but the complaint (Doc. 66) otherwise survives. Stas may file an amended complaint to re-plead Count IV on or before June 15, 2026. Otherwise, the case will proceed on the remaining claims, which Defendants must answer by June 22, 2026.

**ORDERED** in Fort Myers, Florida on June 9, 2026.

Kyle C. Dudek
United States District Judge